IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

IVAN BOYD,

          Plaintiff,

v.

LINDA CORBETT, et al.,

          Defendants.

OPINION AND ORDER

17-cv-944-slc

*Pro se* plaintiff Ivan Boyd, a prisoner at the Wisconsin Secure Program Facility (WSPF), is proceeding in this civil lawsuit pursuant to 42 U.S.C. § 1983, on an Eighth Amendment claim against defendant Linda Corbett, for her alleged failure to respond to his need for a properly-fitting mask for his Continuous Positive Airway Pressure (CPAP) machine between about September of 2016 and October of 2017, when he fainted and injured himself.[1] Corbett filed a motion for summary judgment (dkt. 84), and, after responding substantively to Corbett's motion, Boyd filed a motion for assistance in recruiting counsel (dkt. 113).

Boyd has demonstrated that he can adequately handle the legal and factual complexities of this case, so I am denying his request for assistance in recruiting counsel.

I am granting Corbett's motion for summary judgment because the evidence establishes that Corbett was not deliberately indifferent to Boyd's need for a new face mask.

---

[1] I also granted Boyd leave to proceed against other defendants who were working at WSPF when Boyd was having issues with his CPAP mask. Boyd's claims against defendant McArdle were dismissed without prejudice for his failure to exhaust his administrative remedies with respect to his claims against her. (Dkt. 69.) Boyd stipulated to the dismissal of his claims against defendants Timothy Bromeland, Sandra Mumm, Richard Rutherford, Lucas Stowell, and Jolinda Waterman pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Dkt. 114.) I surmise that Boyd has settled with these defendants.

## UNDISPUTED FACTS[2]

Plaintiff Ivan Boyd currently is incarcerated at the Redgranite Correctional Institution, but the events related to his claim against Corbett took place when he was incarcerated at Dodge Correctional Institution (Dodge), and the Wisconsin Secure Program Facility (WSPF). Defendant Linda Corbett is a retired respiratory therapist. Corbett previously was employed by Guardian Health Staff (Guardian), which assigned her to the State of Wisconsin to provided respiratory therapy services to prisoners incarcerated by the Wisconsin Department of Corrections (DOC).

Corbett was responsible for overseeing the respiratory therapy needs of over 900 DOC prisoners state-wide who used CPAP equipment to address their sleep apnea. Because these prisoners were scattered throughout the state, Corbett was not assigned to work at one particular facility. As a result, Corbett's standard practice for seeing patients was to rely on the staff at each institution's Health Services Unit (HSU) to forward to her specific requests from prisoners. Corbett also monitored prisoners' CPAP usage remotely and reported each prisoner's usage to his institution's HSU on a monthly basis. (There is no evidence that Corbett regularly or substantively reviewed or analyzed this data as to any particular prisoner).

On August 8, 2016, while he was incarcerated at Dodge, Boyd was diagnosed with Obstructive Sleep Apnea. On August 23, 2016, Dr. Richard Fuller ordered a CPAP machine and mask for Boyd. On August 25, 2016, Corbett personally delivered Boyd's CPAP equipment and instructed him how to use and care for the equipment. Boyd avers that Corbett "strongly

---

[2] The following facts are material and undisputed, unless I note otherwise. I have drawn these facts from defendant's proposed findings of fact and plaintiff's response, and the evidence cited in those proposed facts, as necessary.

advised" him to use the CPAP machine every night because obstructive sleep apnea could result in death during the night. (Boyd Decl. (dkt. ¶ 5.) Afterward, Boyd attempted to use the CPAP machine, but he had difficulties with the fit of the mask.

On September 8, 2016, Corbett had a follow-up appointment with Boyd to discuss how the CPAP mask should fit. Corbett wrote in her notes that Boyd reported "some problems" with the mask, and that they "discussed how the mask should fit" and she "encouraged [him] to keep using [the mask]." (Corbett Decl. (dkt. 87) ¶ 5; Boyd Ex. B (dkt. 59-2).) Boyd disputes this proposed finding of fact, claiming that he informed Corbett that the mask caused severe pain, and that "Corbett promised that she would return with a new mask." However, the evidence he cites in support (Compl. (dkt. 1) ; Pl. Ex. A-005 (dkt. 102-1, at 5)), does not include such a specific statement from Corbett. Rather, Boyd avers that Corbett said she "would bring with her more equipment" the next time she was at the institution, and she directed him to submit a Health Service Request (HSR) to her attention to remind her to bring him a new mask. (Boyd Decl. (dkt. 97) ¶ 9.) I will accept as undisputed Boyd's averment that he reported the mask was causing him pain, and that Corbett asked him to submit an HSR. The parties dispute what exactly Corbett told Boyd that *she* would do as follow up.

According to Boyd, on September 25, 2016, as a follow-up to that meeting, he submitted a Health Service Request (HSR) asking to see the respiratory therapist. On September 28, 2016, Boyd was seen in the HSU. On Boyd's HSR form, a Dodge HSU staff member wrote

> client scheduled for sick call R/T HSR [Respiratory therapist Health Service Request] 9/25/16. After short discussion client felt ∅ [no] need for sick call.
>
> (Boyd Ex. C (dkt. 59-3).)

3

Boyd avers that this HSU staff member was Dr. Fuller, who assured Boyd that he would make note of Boyd's complaints about the mask for Corbett. However, Boyd did not see or hear from Corbett after that date, even though his "Respiratory Care Plan" form included a notation that he would be interviewed after 180 days for dryness, fatigue/naps, and snoring. (Boyd Ex. A -005 (dkt. 102-1, at 9).). Corbett explains that the respiratory therapist is not required personally to conduct this interview. (Ex. to Pytlik Decl. (dkt. 109, at 3-4).)

Corbett did not meet again with Boyd about his mask until November 2017, after Boyd's fainting spell and injuries. According to Corbett, because she did not receive any requests from Boyd or from his institution's HSU asking her to meet with Boyd regarding the fit of his CPAP mask, she did not initiate a meeting with him or take further action. As a result, from September 8, 2016 until October of 2017, Corbett's only involvement in Boyd's care was monitoring his use of the CPAP equipment remotely using telemetry monitoring equipment at her office, and submitting reports of those results on a monthly basis to the HSU of Boyd's institution.

In December of 2016, Boyd was transferred to WSPF. On September 26, 2017, Corbett emailed WSPF's HSU manager Jolinda Waterman, reporting that "It looks like he hasn't used it at all since I set him up."[3] Waterman followed up with Boyd on October 13, 2017. Boyd told Waterman that he wasn't using his CPAP machine because the mask didn't fit. This led Waterman to ask Corbett to meet with Boyd during her next visit to WSPF.

Around this same time, Boyd submitted several HSRs complaining that his face mask was causing him severe pain and prevented him from using the CPAP machine. No one from WSPF ever relayed these complaints to Corbett, so Corbett was unaware of them. On October 27,

---

[3] (*See* dkt. 102-1 at 21.) There is no indication that Corbett was aware of this prior to September 26, 2017.

2017, Boyd had a "sleep apnea event" in his cell that caused him to fall, strike his head and lose consciousness. Boyd was treated at a hospital that day, and he subsequently submitted multiple HSRs complaining that he had been experiencing confusion, speech problems, and issues with his memory. On November 1, 2017, Corbett met with Boyd, and she ordered a new mask for him that same day.

OPINION

I. **Corbett's Motion for Summary Judgment**

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

State prisoners have an Eighth Amendment right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must establish (1) an objectively serious medical condition, to which (2) a state official was deliberately, that is subjectively, indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Corbett does not dispute that Boyd's

5

sleep apnea was a serious medical need, so the question is whether the evidence permits a reasonable inference that Corbett was deliberately indifferent to Boyd's sleep apnea.

To prove deliberate indifference, Boyd must come forward with evidence that Corbett acted with a "sufficiently culpable state of mind." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quotation omitted). This requires Boyd to show that Corbett "had *actual* knowledge that [Boyd] was at risk of serious harm and *deliberately ignored* that risk." *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 778 (7th Cir. 2014). While a prisoner does not need to "establish that officials intended or desired the harm that transpired," *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)), deliberate indifference is more than negligence, or even gross negligence, *Figgs v. Dawson*, 829 F.3d 895, 902-03 (7th Cir. 2016); it is "something akin to recklessness" that "approaches intentional wrongdoing." *Arnett*, 658 F.3d at 751. *See also McCottrell v. White*, 933 F.3d 651, 672 (7th Cir. 2019)("deliberate indifference means criminal recklessness") (citing *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994)).

Corbett contends that she was not deliberately indifferent to Boyd's sleep apnea treatment needs because (1) she never knew that Boyd was having issues with his CPAP machine and mask; and (2) she relied on HSU staff to relay specific prisoner concerns about their respiratory issues to her, and no one informed her that Boyd was reporting dangerous symptoms leading up to his fainting spell.

Corbett's first argument does not pass Rule 56(a)'s threshold. Corbett maintains that she did not know that Boyd was suffering ill-effects from not using his CPAP machine, so that she cannot be held liable for Boyd's injuries suffered when he fainted in October 2017. This argument implies that Corbett's failure to provide Boyd with a better-fitting mask could not have

contributed to his symptoms a year later. This is a debatable implication at the summary judgment stage. Corbett would have been aware of the risks Boyd faced by not using his CPAP machine; according to Boyd, Corbett told him that he could die if he didn't use his mask, and it is well established that untreated sleep apnea carries the risk of serious injury or death. *See, e.g.*, *Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 423 (7th Cir. 2017) (noting that "sleep apnea can result in death"); *Silk v. City of Chicago,* 194 F.3d 788, 795 (7th Cir.1999) ("[A]lthough sleep apnea itself is not fatal, the secondary cardiovascular effects—including hypertension and stroke–can be.").

Further, Boyd's version of what he said to Corbett during their September 8, 2016 meeting permits a reasonable inference that Corbett knew that Boyd's mask didn't fit. Boyd claims that he told Corbett that the mask "was too tight and caused severe pain to the bridge of his nose and jaw." (Boyd Decl. (dkt. 97) ¶ 8.) If a jury were to believe Boyd's testimony, then it could reasonably conclude that Corbett was aware that Boyd was suffering from a serious medical need when they discussed his CPAP mask on September 8, 2016.

All of this being so, Corbett nonetheless is entitled to summary judgment because it would be unreasonable to infer that her subsequent inaction rose to the level of deliberate indifference. For summary judgment purposes, I accept as true Boyd's claim that Corbett said she would bring new equipment with her on her next visit. But it is undisputed that Corbett *also* directed Boyd to submit an HSR to his HSU for the purpose of triggering this visit. Additionally Corbett wrote in Boyd's treatment notes for September 8, 2016 that she had encouraged Boyd to keep using his mask. It also is undisputed that Corbett never received a another communication from Boyd, and she did not receive any report from WSPF that Boyd was having any issues until *she* followed

up with WSPF to ask why Boyd wasn't using his CPAP machine.  The fact that Corbett knew this demonstrates that she was continuing to regularly monitor Boyd's CPAP use, which in turn prompted her to inquire as to his well-being.

Therefore, the operative question for purposes of Corbett's summary judgment motion is whether, when accepting as true all of Boyd's representations about what was said at his September 8, 2016 appointment with Corbett, it was deliberately indifferent for Corbett to rely on Boyd to submit an HSR asking for the new mask.  On these facts, no reasonable jury could make this finding.

Corbett's practice was to respond to treatment issues and requests forwarded by HSU staff at the DOC institutions before following up directly with prisoners.  In other words, Corbett did not reach out proactively to her patients to ask how they were doing: she directed her patients to flag their concerns to the HSU in their institution, so that they could be brought to her attention.  Corbett's approach—-to rely on the HSU staff of the DOC's various institutions to reach out to her directly about prisoner CPAP needs— is an example of appropriate delegation of the provision of good medical care to the HSU staff of each institution.

> Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.  The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)

Corbett was supervising the respiratory therapy needs of over 900 prisoners in correctional institutions scattered across the entire state.  It was not reckless for Corbett to manage her caseload by relying on HSU staff, who were present at each patient's institution and

thus in a better position to review and triage prisoner requests for care related to sleep apnea and other respiratory needs. Indeed, this is the way that prisoners receive *all* medical care within their institutions: if they have a treatment need, then they flag it by filing an HSR with their HSU, which then follows up by scheduling an appointment. It is not up to an off-site care provider such as a cardiologist or a podiatrist—or a respiratory therapist—to reach out to her patients within a correctional institution; it is up to the patient to alert HSU staff that he needs to see the care provider.

This segues to the court's conclusion that it was not reckless for Corbett's to put the onus on Boyd to seek follow-up by submitting an HSR to his HSU. Boyd takes issue with Corbett's approach, pointing out that if Corbett knew about his need for a different mask, then Boyd should not have been required to submit a follow-up HSR. That's a fair question, but it is equally fair for Corbett to ask why Boyd didn't follow Corbett's directions and specifically ask for a mask after that meeting. Boyd says that he submitted another HSR on September 25, 2016: the evidence shows that Boyd met with a care provider (Boyd says it was Dr. Fuller), who noted that Boyd "felt no need" to see a respiratory therapist. Boyd has not submitted any evidence indicating that Corbett ever received that HSR; logic suggests that it was never sent, because Dr. Fuller ascertained that Boyd didn't see a need to meet with Corbett. The note in Boyd's medical record suggests that Boyd himself is to blame for putting the brakes on a follow-up appointment with Corbett; even if Dr. Fuller misunderstood what Boyd wanted, that cannot be laid at Corbett's feet. She asked for a followup request from Boyd (*via* his HSU) but she never got one.

The result is the same with respect to Boyd's October 2017 HSRs: Corbett didn't know about Boyd's symptoms leading up to his fainting spell because nobody reported them to her.

9

The way Corbett had left it with Boyd was that she would come when called; nobody called. Therefore, Corbett's failure to meet with Boyd does not amount to a complete abandonment of his care. There is a solid argument that care providers at WSPF failed to respond appropriately to Boyd's complaints about his CPAP mask in October of 2017; one prong of this argument would be that they failed to alert Corbett that Boyd was having problems.[4] Corbett, however, cannot be found deliberately indifferent to a situation about which she had no knowledge.

The worst that can be said about Corbett's inaction following her September 8, 2016 meeting with Boyd is that she might be taking a chance by relying on Boyd (and his institutional care providers) to initiate a follow-up meeting. Perhaps it was a mistake for Corbett to assume that no news was good news, that is, that Boyd's failure to request a follow-up meant that things were okay. Perhaps Corbett should have contacted WSPF sooner to ask someone to investigate why Boyd had stopped using his CPAP equipment (although the evidence does not show when she first realized this). These mistakes, considered in their totality, might support a claim of malpractice, but as already noted, inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996); *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003) (deliberate indifference requires "more than mere or gross negligence, but less than purposeful infliction of harm"). On this record, where there was some confusion as to *who* would be taking the next step to get Boyd a new mask, it would be unreasonable to infer that Corbett acted with reckless disregard of Boyd's serious medical need by relying on Boyd's on-site care

---

[4] As observed above in footnote 1, it appears that Boyd already has settled his beef with the DOC employees against whom the court granted him leave to proceed (*See* dkt. 17), some of whom were supposed to be the go-betweens for Boyd and Corbett.

providers to relay his concerns, a reliance that she had conveyed to Boyd at their September 8, 2016 first meeting.

Boyd argues that Corbett should have proactively investigated Boyd's situation when she observed through her remote monitoring that Boyd had not used his CPAP machine for over a year. This is a fair point, but there is no evidence that Corbett ever reviewed or analyzed the monthly data for any of her prisoners. Neither is there any evidence as to *when* Corbett first noticed this. Logic suggests that it was in September, 2017, when she sent her email to Waterman; if she had noticed it earlier, then she probably would have flagged it earlier.

More saliently, and as previously noted, when Boyd had complained about his mask to Corbett, Corbett encouraged Boyd to keep using his mask and she asked him to submit a request for a new one. There is no evidence that Boyd told Corbett he was going to stop using the mask, or that Corbett otherwise had reason to believe that Boyd wasn't going to use the mask because of the fit. So there was no reason for Corbett to assume that she needed to monitor Boyd's monthly CPAP usage more closely: it was reasonable for her to assume that he would look out for himself by submitting a follow-up HSR. (And the evidence suggests that when Boyd met with Dr. Fuller after his first meeting with Corbett, Boyd told Dr. Fuller there was no need for him to meet with Corbett because Boyd believed Fuller would follow up with Corbett for a new mask).

All this being so, perhaps Corbett should have noticed and investigated Boyd's abandonment of his CPAP machine earlier, but at most, this was negligence, not recklessness. As already noted, there is no evidence that Corbett even reviewed the telemetric data for her 900 patients. Instead, the evidence shows that Corbett expected and relied on proactive reporting from her patients through their HSUs. Corbett had made clear to Boyd (and presumably to the

HSUs at Dodge and WSPF) that she was counting on them to flag any CPAP issues for her. I already have found that this was a reasonable plan for Corbett, given her broad responsibilities for such a large patient population. Corbett never received a follow up request from Boyd or heard from WSPF staff as to why Boyd had stopped using his CPAP machine. Thus, there is no evidence that Corbett had actual knowledge that Boyd was at risk of serious harm and deliberately ignored that risk. *See also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("[e]ven objective recklessness– failing to act in the face of an unjustifiably high risk that it so obvious that it *should* be known–is insufficient to make out a claim"; a defendant can avoid liability by proving she was "unaware even of an obvious risk to inmate health or safety")

Boyd asserts that Corbett's failure to follow up was out of compliance with the procedure set forth in the Respiratory Care Plan, providing that she would follow up with him at the "180 day mark" to check him for symptoms. However, according to Corbett, that care plan was intended for institutional HSU staff to apply, not Corbett, and Boyd has not submitted any evidence to the contrary. Again, it appears that any failures here were attributable to on-site caregivers, who no longer are part of this lawsuit.

Finally, Boyd points to his September 25, 2016 HSR that he directed to Corbett specifically. However, Boyd has not come forward with any evidence suggesting that Corbett actually received that particular HSR. In fact, the evidence related to Boyd's September 28 meeting with Dr. Fuller indicates that Boyd and Fuller discussed the mask issue, and Dr. Fuller said he would follow up with Corbett. There is no evidence indicating that Dr. Fuller (or anyone else from the DOC) actually communicated Boyd's complaint to Corbett. As such, Corbett's

failure to respond specifically to Boyd's September 25 HSR does not support a finding of deliberate indifference.

In summary, given that Corbett specifically directed Boyd to submit a follow up HSR if he wanted a new mask, and Corbett never received that request or any other report from Boyd's caregivers that Boyd was experiencing symptoms related to his sleep apnea, no reasonable jury could concluded that Corbett disregarded the possibility that Boyd would suffer injury because of her inaction. Accordingly, I am granting Corbett's motion and will enter judgment in her favor.

## II. Boyd's Motion for Assistance in Recruiting Counsel

Boyd argues that he needs the court to assist him in recruiting counsel because this case involves medical issues and likely will require expert testimony, and he suffers from cognitive issues, anxiety, and depression, all of which leaves him feeling foggy. However, I am not persuaded that these challenges have rendered Boyd unable to meet the requirements of this lawsuit. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007).

As explained above, Boyd's claim against Corbett does not turn on whether Corbett's exercise of medical judgment constituted deliberate indifference. The question is whether Corbett's inaction amounts to deliberate indifference, and most of the evidence relevant to answering this question revolves around what did Corbett know and when did she know it. Further, while I accept that Boyd faces cognition challenges, his above-average performance in this lawsuit establishes that those challenges have not created a barrier to him understanding the pivotal facts or the legal standard applicable to his claim. Boyd responded to Corbett's motion

by filing an on-point opposition brief, reasonable responses to Corbett's proposed findings of fact, and his own proposed findings of fact as well. These filings demonstrate that Boyd has a clear understanding of the issues relevant to his claim and is capable of articulating cogent arguments in support of it. Boyd's claim against Corbett arises out of a set of essentially undisputed facts that this court views as not establishing deliberate indifference. Recruiting a volunteer lawyer to assist Boyd would not have changed the facts material to the court's decision. Accordingly, I am denying Boyd's motion for assistance in recruiting counsel.

ORDER

IT IS ORDERED that:

1. Defendant Linda Corbett's motion for summary judgment (dkt. 84) is GRANTED.

2. Plaintiff Ivan Boyd's motion for assistance in recruiting counsel (dkt. 113) is DENIED.

3. The clerk of court is directed to enter judgment in Corbett's favor and close this case.

Entered this 30th day of December, 2019.

BY THE COURT:
/s/
STEPHEN L. CROCKER
Magistrate Judge